1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10
11
12
13
14
15
16
17

| | |
|---|---|
| SHAWN A. ORMBERG,<br><br>          Plaintiff,<br><br>  v.<br><br>JO ANNE B. BARNHART, Commissioner of<br>Social Security,<br><br>          Defendant. | CASE NO.    C05-5456FDB<br><br>REPORT AND<br>RECOMMENDATION<br><br>Noted for February 24, 2006 |

18
19
20
21
22
23

Plaintiff, Shawn A. Ormberg, has brought this matter for judicial review of the denial of her application for supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

24
25
26

Plaintiff currently is forty-five years old.[1] Tr. 27.  She has a general equivalency diploma and has no past relevant work experience. Tr. 83, 85, 470.

27
28

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

On January 22, 2001, plaintiff filed an application for SSI benefits, alleging disability as of January 1, 1990, due to depression, arthritis in both hips, and pain in her neck, back, left leg, left buttocks and both knees. Tr. 62, 77, 469-70. Her application was denied initially and on reconsideration. Tr. 27, 29-30, 36. A hearing was held before an administrative law judge ("ALJ") on October 22, 2002, at which plaintiff, represented by counsel, appeared and testified as did a medical expert and a vocational expert. Tr. 505-52. On December 7, 2002, the ALJ issued a decision, determining plaintiff to be not disabled because she was able to perform other jobs existing in significant numbers in the national economy. Tr. 485-93.

Plaintiff's request for review was denied by the Appeals Council on September 23, 2003. Tr. 495. On October 30, 2003, plaintiff filed a complaint with this court seeking review of the Commissioner's denial of her application for SSI benefits. See C03-5609RJB (Dkt. #1). On March 12, 2004, based on the stipulation of the parties, the court remanded this matter back to the Commissioner to: hold a *de novo* hearing; evaluate plaintiff's obesity and other diagnoses, including her pain disorder, personality disorder, dysthymic disorder, and migraine headaches; evaluate her testimony and residual functional capacity; and determine her ability to perform other work. See C02-5393RJB (Dkt. #12 and #13).

On remand from this court, a second hearing was held before the same ALJ on October 14, 2004, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 662-703. On May 6, 2005, the ALJ issued a decision, again determining plaintiff to be not disabled, finding specifically in relevant part:

    (1)    at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity since the date of her application for benefits;

    (2)    at step two, plaintiff had "severe" impairments consisting of a depressive disorder, a somatoform disorder, a personality disorder, obesity, and chronic pain;

    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

    (4)    at step four, plaintiff had the residual functional capacity to perform sedentary work, with certain additional non-exertional limitations; and

    (5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 480-81. It does not appear from the record that the Appeals Council assumed jurisdiction of the case. 20 C.F.R. § 416.1484. The ALJ's decision therefore became the Commissioner's final decision after sixty

days. Id.

On July 8, 2005, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings, for the following reasons:

(a)     the ALJ erred in failing to find plaintiff's sleep apnea and migraine headaches to be "severe" impairments;

(b)     the ALJ erred by ignoring or overlooking some of the findings made by the two non-examining consulting psychologists in the record;

(c)     the ALJ erred in assessing plaintiff's credibility;

(d)     the ALJ erred in assessing plaintiff's residual functional capacity; and

(e)     the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

The undersigned finds, however, that the ALJ did not err in determining plaintiff to be not disabled, and therefore recommends that the court affirm the ALJ's decision. While plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.     The ALJ's Step Two Analysis Was Proper

To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step sequential evaluation process. 20 C.F.R. § 416.920. At step two of that process, the ALJ must determine if an impairment is "severe." Id. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), ( c); Social Security

1   Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes

2   necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

3          An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

4   than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.

5   Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

6   has the burden of proving that her "impairments or their symptoms affect her ability to perform basic work

7   activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

8   601 (9th Cir. 1998).  The step two inquiry described above, however, is a de minimis screening device used

9   to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

10         Plaintiff argues the ALJ erred by failing to find that her sleep apnea and migraine headaches were

11  "severe" impairments.  The undersigned disagrees.  With respect to plaintiff's sleep apnea, the ALJ found

12  that impairment to be not severe because it was "controlled with the use of a CPAP machine," and thus it

13  resulted in "no significant limitations." Tr. 477-78.  This finding is supported by the substantial evidence in

14  the record.  While there are references to plaintiff's sleep apnea in the record (Tr. 400, 577-80, 617, 619,

15  621), there is no objective medical evidence to show that this condition had more than a minimal effect on

16  her ability to work.

17         Plaintiff argues it was premature and speculative for the ALJ to have found her sleep apnea to be not

18  severe, because the record indicates she had not had a follow-up trial assessment of the CPAP machine at

19  the time of her hearing.  However, while it seems plaintiff did have "some difficulty" tolerating the nasal

20  mask during her most recent sleep study, even so, that same study clearly showed "resolution" of her sleep

21  disorder, including her breathing and snoring problems, with the CPAP machine. Tr. 577-78.  In any event,

22  as explained above, the objective medical evidence in the record fails to show that plaintiff suffered from

23  significant functional limitations as the result of her sleep apnea.

24         With respect to plaintiff's migraine headaches, the ALJ found them to be not severe as well, finding

25  specifically that:

26         In regard to the claimant's migraine headaches, a review of the medical record shows
           only sporadic treatment for this impairment since the claimant applied for benefits in
27         January 2001.  Further, the claimant's migraine headaches have responded well to
           medications such as Imitrex and she experiences relief of her symptoms with such
28         medications.  The claimant has never required hospitalization for migraines, she has not
           been evaluated by a neurologist, and she has not sought any treatment from specialists in

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> this area of medicine (Exhibit 23F and 24F).  Consequently, since the claimant's
> occasional migraine headaches respond well with the use of medication, I conclude they
> impose only slight limitations on the claimant's functional abilities.  Therefore, both the
> claimant's migraines and sleep apnea are not severe impairments.

Tr. 478.  Again, these findings are supported by the substantial evidence in the record.  As with plaintiff's sleep apnea, while there are references to plaintiff's migraine headaches in the record (Tr. 207, 209, 211, 221, 292, 400, 608, 636, 644), there is no objective medical evidence to show that they had more than a minimal effect on her ability to work.

Plaintiff argues that the statement of Dr. Robert G. Hoskins, a non-examining consulting physician, that her migraines were "not of disabling severity" (Tr. 292), implies that he thought they at least met the severity standard of step two.  Although such an interpretation of the meaning of this phrase certainly is possible, nowhere in his opinion did Dr. Hoskins indicate that this is what he meant.  Indeed, he provided no specific significant limitations he felt were caused by her headaches, and, as discussed above, the other objective medical evidence in the record show she had none.

In any event, it also is entirely reasonable for the ALJ, as she likely did here, to have read the above phrase as meaning that Dr. Hoskins believed her migraine headaches did not cause significant limitations.  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (ALJ responsible for determining credibility and resolving ambiguities and conflicts in evidence).  Plaintiff also argues the ALJ erred in ignoring and/or overlooking her testimony that she still had migraines averaging once a week, and sometimes lasting from one to three days at a time.  As discussed below, however, the ALJ did not err in discounting plaintiff's credibility.  In addition, the mere fact that a claimant suffers from an impairment is not sufficient to show that it is severe.  Rather, the claimant also must show that he or she has significant functional limitations as a result thereof.  As explained above, plaintiff has not done so in this case.

II.      The ALJ Did Not Err in Evaluating the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence.  Reddick, 157 F.3d at 722.  Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at

1   all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this

2   responsibility." <u>Id.</u> at 603.

3        In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

4   supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a

5   detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

6   thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the evidence."

7   <u>Sample</u>, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

8   ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

9        The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

10  either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

11  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

12  legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the

13  ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739

14  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

15  why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07

16  (3d Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

17       In general, more weight is given to a treating physician's opinion than to the opinions of those who

18  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

19  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or

20  "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190,

21  1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

22  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

23  opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A nonexamining physician's opinion may

24  constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-

25  31; <u>Tonapetyan</u>, 242 F.3d at 1149.

26       Plaintiff argues the ALJ erred by ignoring/overlooking some of the mental functional limitations

27  found by Anita M. Peterson, Ph.D., and Charles Regets, Ph.D., in a mental residual functional capacity

28  assessment ("MRFCA") form they completed in early June 2001.  In the "summary conclusions" section of

that MRFCA form, Drs. Peterson and Regets found plaintiff moderately limited in her ability to: maintain

attention and concentration for extended periods; perform activities within a schedule; maintain regular

attendance; be punctual within customary tolerances; complete a normal workday and workweek; and

perform at a consistent pace. Tr. 272-73. Plaintiff asserts the ALJ should have included each of these non-

exertional limitations in her assessment of her residual functional capacity.

The ALJ included the following non-exertional limitations in her assessment of plaintiff's residual

functional capacity:

> The claimant has moderate nonexertional limitations caused by mental impairments, but
> she retains the ability to perform simple, routine, repetitive job tasks. She can work
> independently, but has limited judgment and should have a low stress job. The claimant
> can work adequately with supervisors and coworkers, but needs to have limited
> interaction with the public.

Tr. 478. Defendant argues this portion of the ALJ's assessment of plaintiff's residual functional capacity

adequately accounted for the work limitations found by Dr. Peterson and Dr. Regets. For the reasons set

forth below, the undersigned agrees.

In addition to completing the summary conclusions section noted above, a "[d]etailed explanation of

the degree of limitation for each category [checked in the summary conclusions section] . . ., as well as any

other assessment information" the evaluator deems appropriate, "is to be recorded in" the "functional

capacity assessment" section of the MRFCA form. Tr. 272. The functional capacity assessment section thus

is to be used to explain the evaluator's "conclusion in narrative form," which also is to "[i]nclude any

information which clarifies limitation or function." Tr. 274. In this functional capacity assessment section,

Drs. Peterson and Regets wrote in relevant part as follows:

> The Claimant is capable of work related activity as detailed below:
>
> 1. Claimant is able to understand, follow, and remember more than three step
>    verbally presented material. The claimant would function best in low stress
>    situations where there is the opportunity to think through solutions.
>
> 2. Claimant is able to persist at simple and some complex repetitive tasks within a
>    normal work shift.
>
> 3. Claimant could work with supervisors and co-workers but would be more
>    successful away from the general public.
>
> 4. Stress tolerance tends to vary but the claimant is able to adapt to situations
>    requiring claimant to function independently and care for her children.

Id.

As noted above, the non-exertional functional limitations the ALJ included in her assessment of plaintiff's residual functional capacity largely comports with this narrative. The only other medical source in the record to provide an opinion concerning specific functional limitations resulting from plaintiff's mental impairments was Dr. Michael L. Furst, who examined plaintiff in late March 2001. With respect to her work-related capabilities, Dr. Furst opined as follows:

> Other than some mild irritability, there was nothing in today's interview to suggest that patient would have difficulty interacting appropriately with co-workers, the public or supervisors. Her cognitive capacities are largely intact and she should not have difficulties following detailed instructions, monitoring her own safety on the job or with task persistence.

Tr. 151. As with the narrative statement provided by Drs. Peterson and Regets, Dr. Furst's findings with respect to plaintiff's ability to work are largely consistent with those of the ALJ.

While the narrative statement provided by Dr. Peterson and Dr. Regets does not completely track all of the mental functional limitations they checked in the summary conclusions section of the MRFCA form, the purpose of the narrative statement is to explain and clarify the summary conclusions section. Tr. 274. The undersigned therefore cannot fault the ALJ for relying more on that statement than on the boxes checked in the summary conclusions section. For example, the ALJ in summarizing the findings of Drs. Peterson and Regets correctly noted they had concluded that plaintiff could "understand, remember and carry out more than three step verbally presented materials," could "persist at simple and some complex tasks," and could "work successfully with coworkers and supervisors." Tr. 473.

The most that thus can be said regarding the additional limitations plaintiff argues the ALJ should have included in her assessment of plaintiff's residual functional capacity is that there is some conflict or ambiguity in the findings Dr. Peterson and Dr. Regets provided in their MRFCA form. Again, however, the resolution of conflicts and ambiguities in the evidence are solely the functions of the ALJ. Sample, 694 F.2d at 642; Morgan, 169 F.3d at 601. As discussed above, furthermore, the ALJ did not err in adopting the more detailed findings contained in the narrative statement provided by Drs. Peterson and Regets over the checked boxes in the summary conclusions section.[2] See also Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (expressing preference for individualized medical opinions over check-off reports).

---

[2]The same thing can be said, for that matter, with respect to the "moderate" restrictions Dr. Peterson and Dr. Regets noted in checking the degree of limitation boxes contained in the "B" criteria section of the psychiatric review technique form they completed at the same time. See Tr. 286.

Lastly, the undersigned notes that Dr. Furst, an examining physician, found plaintiff's "cognitive capacities" to be "largely intact." Tr. 151.  Dr. Furst also did not find her to have the additional limitations she argues the ALJ should have adopted, and even expressly opined that she should not have any difficulty with "task persistence," contradicting the summary conclusions finding of Drs. Peterson and Regets that she was moderately limited in her ability to perform at a consistent pace. Id.; see Lester, 81 F.3d at 830-31 (examining physician opinion entitled to greater weight than opinion of nonexamining physician).  Further, while a nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record," no other medical source in the record found plaintiff to be moderately or more severely limited in the above areas. Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

In her reply brief, plaintiff makes the additional argument that the ALJ's finding that she needed a low stress job was defective.  However, plaintiff did not raise this issue in her opening brief, and on that basis alone, the undersigned is not inclined to find any error here.  The undersigned will note though that the case law cited by plaintiff to support her argument are distinguishable on their facts.  Unlike in those cases, there was specific objective medical evidence in this case to support the ALJ's findings concerning plaintiff's need for a low stress job.  For example, Dr. Peterson and Dr. Regets, on whose findings plaintiff relies for the arguments she makes above, opined that plaintiff "would function best in low stress situations where there is the opportunity to think through solutions." Tr. 274.  That opinion appears to be based for the most part on the findings of Norma L. Brown, Ph.D., an examining psychologist, who opined that she did "not appear to be able to adequately tolerate stress at the present time." Tr. 145.

In finding that plaintiff retained the ability to perform simple, routine, repetitive job tasks and to work adequately with supervisors and coworkers, but should only have limited interaction with the public, furthermore, the ALJ appears largely to have complied with the requirements of the applicable case law and Social Security rulings in this area. See Lancellotta v. Secretary, 806 F.2d 284, 285-86 (1st Cir. 1986); Weilar v. Shalala, 922 F.Supp. 689, 699-700 (D.Mass. 1996); Felver v. Barnhart, 243 F.Supp.2d 895, 906-07 (N.D.Ind. 2003) (ALJ made no findings regarding how claimant's stress affected ability to understand, carry out and remember instructions, respond appropriately to supervision, and coworkers, and deal with customary work pressures); SSR 85-15; SSR 85-16 (consideration of ability to understand, carry out and remember instructions, respond appropriately to supervision and coworkers, and deal with customary work

1   pressures is required for proper evaluation of severity of mental impairments).

2   III.    The ALJ Properly Assessed Plaintiff's Credibility

3          Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

4   639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

5   F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

6   based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

7   claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

8   as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th

9   Cir. 2001).

10         To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

11  disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify

12  what testimony is not credible and what evidence undermines the claimant's complaints."  Id.; Dodrill v.

13  Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering,

14  the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at

15  834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811,

16  818 (8th Cir. 2003).

17         In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

18  evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

19  testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

20  also may consider a claimant's work record and observations of physicians and other third parties regarding

21  the nature, onset, duration, and frequency of symptoms.  Id.

22         The ALJ discounted plaintiff's credibility in part because "[t]he objective medical evidence when

23  considered as a whole" was "not consistent" with her allegations of disabling symptoms.  Tr. 476.  A

24  determination that a claimant's complaints are "inconsistent with clinical observations" though can satisfy

25  the clear and convincing requirement.  Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir.

26  1998).  As discussed above, the ALJ did not err in finding plaintiff's sleep apnea and migraine headaches

27  not severe, despite plaintiff's allegations of significant functional limitations resulting therefrom.  Plaintiff

28  also claimed she was disabled based on her obesity, but, as the ALJ noted, none of her physicians assessed

1  that impairment "as significantly limiting her physical or mental ability to perform basic work activities." Tr.

2  476-77.  In addition, the only medical sources to have provided opinions regarding plaintiff's specific work-

3  related mental functional limitations, indicate that those limitations were far from disabling. See Tr. 151,

4  272-74.  As such, the ALJ did not err in discounting plaintiff's credibility for this reason.

5      Plaintiff argues the ALJ ignored/overlooked her own finding that she had a "severe" somatoform

6  disorder. See Tr. 480.  This, plaintiff asserts, helps explain her increased pain levels even in the absence of

7  objective evidence of a marked physical impairment.  However, a finding that an impairment is "severe" at

8  step two of the disability evaluation process does not require the ALJ to find plaintiff's pain complaints to

9  be credible.  That is, a finding of severity is only a de minimis screening device to dispose of groundless

10  claims, and does not in itself mean the nature and extent of the impairment is such as to cause the claimant

11  to be severely limited in his or her functioning.  In addition, while plaintiff has been diagnosed with having a

12  somatization disorder (Tr. 400), there is no indication in the record that impairment itself has limited her in

13  her ability to work in any significant way.  Indeed, the examining psychologist who diagnosed her with that

14  impairment stated that she "would benefit from DVR participation and continued participation in her part

15  time employment." Tr. 401.

16      Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a

17  finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain

18  testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989); see also Meanal v. Apfel, 172 F.3d 1111,

19  1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe, and claimant's failure to

20  request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428,

21  1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only to be

22  suggestive of lower level of pain and functional limitation).

23      The ALJ discounted plaintiff's credibility in part because she had "received minimal and sporadic

24  treatment for her allegedly disabling mental impairments." Tr. 477.  Specifically, the ALJ found that:

25      She applied for disability benefits in January 2001, but did not seek any treatment for
      mental impairments until January 2003.  The claimant's failure to seek medical treatment
26      for such a long period of time indicates tolerable mental health symptoms and
      undermines her allegations of disabling limitations.  Since January 2003, progress notes
27      from the claimant's therapist are quite sparse and document only 4 therapy sessions,
      during which the claimant was progressing and improving (Exhibit 22F).  Further, the
28      claimant testified during the hearing that she is not taking any anti-depressant
      medications at this time.

Id.  These findings are supported by the substantial evidence in the record.

In late February 2001, for example, plaintiff reported that she had only received "three months of therapy" back in 1990 and 1991. Tr. 142.  One month later she reported she had taken Prozac for only "two months" eight years ago, and that while she found Zoloft to be helpful, she also reported she had been "off and on" it for the past eight years to ten years. Tr. 142, 148-49.  Plaintiff, furthermore, has reported having no history of inpatient psychiatric hospitalization. Tr. 149, 393.  In addition, Dr. Furst noted that plaintiff had "apparently refused recommended outpatient psychiatric treatment services," and that she reported "no current prescribing physician for her antidepressant medication." Tr. 150.  In mid-October 2002, plaintiff reported having been prescribed Zoloft presently, but, as noted by the ALJ, she was apparently not taking any anti-depressant medications at the time of the second hearing, even though she testified that she was going to re-new her prescription shortly. Tr. 393, 684-85.

The ALJ further discounted plaintiff's credibility in part for the following reason:

> The record also shows daily activities that are not limited to the extent one would expect, given the claimant's complaints.  As noted above, the claimant testified that she is currently a single parent, managing her own household and finances, and raising a 17 year old teenage son.  The medical records also show some robust physical activities since the claimant applied for benefits, including hiking, perform[ing] yard work, and pushing a car (Exhibit 9F, p.2, Exhibit 7F, p.3, Exhibit 21F, p.32).

Tr. 477.  To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

While plaintiff has reported being very limited in her ability to perform her activities of daily living (Tr. 69-70, 72-74, 101, 145), other evidence in the record, in addition to that noted by the ALJ, indicates she is able to perform such activities at a much higher level (Tr. 148).  For example, she told Dr. Furst she did "some housecleaning in the afternoon," and Dr. Furst stated that she reported "no difficulties cooking meals, [going] grocery shopping or managing household finances." Tr. 148.  Dr. Furst also found that she appeared "able to manage routine daily activities without significant difficulties." Tr. 150.  Drs. Peterson

1   and Regets, furthermore, found her to be only moderately restricted in her activities of daily living, stating

2   specifically that such activities did "not suggest significant deterioration from" her psychiatric problems. Tr.

3   274, 286.  Dr. Dan Neims, Psy.D., noted too that she had been working twenty hours per week running

4   "the front lobby" of a community center, and that she cooked, shopped, and did "some laundry," although

5   her son did the "most strenuous physical tasks." Tr. 395.

6        Lastly, the ALJ discounted plaintiff's credibility for the following additional reason:

7        [I]n 2002 the claimant worked approximately 20 hours per week as an office assistance
         [sic] as required by the Department of Vocational Rehabilitation.  Her job reviews were
8        stellar, describing the claimant as having excellent working relationships, being punctual,
         working late, typing 28 words per minute, and being the best trainee the company had
9        ever received (Exhibit 16F, p.32-38).  The claimant also took computer training classes,
         such as Word, Excel, and Windows (Exhibit 16F, p.10).  This evidence not only refutes
10       the claimant's allegations of social difficulties, concentration deficits, and debilitating
         pain, but suggests that the claimant might actually function better and have more self
11       esteem when she is working.

12   Tr. 477.  Indeed, as discussed above, Dr. Neims opined that she "would benefit from DVR participation and

13   continued participation in her part time employment." Tr. 401.  Although plaintiff argues that such work

14   was only part-time and that she had physical and mental difficulties in completing and in continuing such

15   work, the fact is that her job reviews for the most part do support the ALJ's findings. See Tr. 307-11, 338-

16   41, 343-44.  In any event, while this evidence may in itself not be sufficient to show that she is capable of

17   working full time, it does indicate that she was engaging in work and other activities of daily living at a

18   much greater level than one would expect for someone alleging disability.

19        Finally, plaintiff argues the ALJ erred by not taking into account the objective psychological testing

20   in the record performed by Dr. Neims, which indicated she was not malingering. See Tr. 397.  The ALJ did

21   appear to take this evidence into account, however, as she did not find plaintiff was malingering.  To that

22   extent, plaintiff did get the benefit of the doubt concerning that evidence in that the reasons provided by the

23   ALJ for discounting her credibility were then subject to the "clear and convincing" standard.  As discussed

24   above though, the ALJ met that standard.  Accordingly, for the reasons set forth above, the ALJ did not err

25   in discounting her credibility.

26   IV.    The ALJ Properly Assessed Plaintiff's Residual Functional Capacity

27        If a disability determination "cannot be made on the basis of medical factors alone at step three of

28   the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

REPORT AND RECOMMENDATION
Page - 13

1   assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

2   claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

3   his or her past relevant work, and at step five to determine whether he or she can do other work. Id.

4   Residual functional capacity thus is what the claimant "can still do despite his or her limitations." Id.

5          A claimant's residual functional capacity is the maximum amount of work the claimant is able to

6   perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

7   must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

8   limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

9   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

10  related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

11  medical or other evidence." Id. at *7.

12         Here, the ALJ assessed plaintiff with the following residual functional capacity:

13         The claimant retains the ability to perform the exertional requirements of the full range
       of sedentary work.  She is able to lift and carry up to 10 pounds at a time, and
14         occasionally lift or carry small articles like docket files, ledgers, and small tools.  The
       claimant is able to sit for about 6 hours in an 8-hour workday, and stand and walk for
15         about 2 hours in an 8-hour workday.  The claimant has moderate nonexertional
       limitations caused by mental impairments, but she retains the ability to perform simple,
16         routine, repetitive job tasks.  She can work independently, but has limited judgment and
       should have a low stress job.  The claimant can work adequately with supervisors and
17         coworkers, but needs to have limited interaction with the public.  This residual
       functional capacity is defined as less than the full range of sedentary work.

18
19  Tr. 478.  Plaintiff argues the above residual functional capacity assessment is deficient because the ALJ

20  erred by failing to find her migraine headaches and sleep apnea to be severe and by not factoring into that

21  assessment limitations from: her migraine headaches and sleep apnea; her diagnosed somatoform/pain

22  disorder; and the additional moderate mental functional limitations found by Dr. Peterson and Dr. Regets

23  noted above.  As discussed above, however, the ALJ did not err in finding plaintiff's migraine headaches or

24  sleep apnea to be severe, in evaluating her somatoform disorder, or in not adopting any of the additional

25  moderate mental functional limitations found by Drs. Peterson and Regets.  As such, the ALJ did not err in

26  her assessment of plaintiff's residual functional capacity based on these reasons.

27         Plaintiff further argues that because the ALJ found she had moderate limitations in concentration,

28  persistence and pace, but then later in the same paragraph stated that a consultative evaluation had not

    shown "any significant problems" in "concentration, and or pace," the ALJ thereby implicitly found that at a

REPORT AND RECOMMENDATION
Page - 14

1  minimum she had a significant impairment in persistence, which was not factored into the assessment of her

2  residual functional capacity. See Tr. 478.  As noted above, this is not the first time plaintiff has made this

3  kind of argument.  As before, furthermore, plaintiff's argument is without merit.  While it is possible to read

4  the ALJ's opinion this way, and the court itself may draw "specific and legitimate inferences from the ALJ's

5  opinion," the undersigned finds plaintiff's reasoning unpersuasive and declines to do so in this case. See

6  Magallanes, 881 F.2d at 755.  As discussed above, Dr. Furst found plaintiff should not have any difficulties

7  with task persistence, and because he is an examining physician, his opinion is entitled to more weight than

8  that of Drs Peterson and Regets, both non-examining physicians.

9  V.     The ALJ's Step Five Analysis Was Proper

10         If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

11  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

12  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ

13  can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-

14  Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

15  1162 (9th Cir. 2000).

16         An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

17  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

18  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

19  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

20  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

21  the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

22  description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir.

23  2001).  Here, the hypothetical question the ALJ posed to the vocational expert at the second hearing

24  contained substantially the same limitations as were contained in her assessment of plaintiff's residual

25  functional capacity. Tr. 696-97.  Because, as discussed above, the ALJ did not err in assessing plaintiff's

26  residual functional capacity, the ALJ's hypothetical question was proper as well.

27         In her opening brief plaintiff argued that the testimony of the vocational experts at both the first and

28  second hearings that she was capable of performing the jobs they identified conflicted with the descriptions

of those jobs contained in the Dictionary of Occupational Titles ("DOT"), and thus precluded the ALJ from relying on such testimony to find her capable of performing other work existing in significant numbers in the national economy.  In her reply brief, however, plaintiff concedes that the testimony of the vocational expert at the second hearing regarding the third job identified, that of final assembler, did not conflict with the description of that job contained in the DOT.

The vocational expert at the second hearing, furthermore, found that there were 800 final assembler jobs available in Washington and 42,000 such jobs available in the national economy. Tr. 698.  As noted by defendant, although there is no "bright line" test for determining what constitutes a significant number of jobs at step five of the disability evaluation process, as few as 200 jobs at the state level and 10,000 nationally have been found to be sufficient for step five purposes. See Johnson v. Chater, 108 F.3d 178, 180 n.3 (8th Cir. 1997); see also Barker v. Secretary of Health & Human Servs., 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs in local area); Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995) (2,300 jobs in local county, 64,000 jobs nationwide).  Accordingly, the undersigned finds that even though the ALJ may have erred in finding plaintiff capable of performing the other jobs identified by the two vocational experts, the ALJ did not err in relying on the job of final assembler to find her not disabled. Tr. 479-81.

## CONCLUSION

Based on the foregoing discussion, the court should find the ALJ properly concluded plaintiff was not disabled, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **February 24, 2006**, as noted in the caption.

DATED this 6th day of February, 2006.

Karen L. Strombom
United States Magistrate Judge